JENNER & BLOCK LLP
Kenneth K. Lee (Cal. Bar No. 264296)
klee@jenner.com
Kate T. Spelman (Cal. Bar No. 269109)
kspelman@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Phone:      (213) 239-5100
Facsimile:  (213) 239-5199

JENNER & BLOCK LLP
Dean N. Panos *(pro hac vice)*
dpanos@jenner.com
Richard P. Steinken *(pro hac vice)*
rsteinken@jenner.com
353 N. Clark Street
Chicago, IL 60654
Phone:      (312) 222-9350
Facsimile: (312) 527-0484

Counsel for Defendant Bear Naked, Inc.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANEE THURSTON, LAWRENCE G. KNOWLES, III, and MILAN BABIC, on behalf of themselves and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>BEAR NAKED, INC.,<br><br>　　　　Defendant. | Case No. 11 CV 2890 H BGS<br><br>**DEFENDANT BEAR NAKED, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Consolidated Amended Complaint Filed:  March 12, 2012<br><br>Hearing Date: July 26, 2013<br>Time: 9:00 a.m.<br>Judge: The Honorable Marilyn L. Huff<br>Courtroom: 13 |

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

FACTUAL BACKGROUND.................................................................4

    I.    Bear Naked's Food Products and Philosophy ......................................4

    II.   The term "natural" is not susceptible to a single, uniform definition...6

    III.  Plaintiffs challenge 11 different products that have been marketed differently and feature different packaging...........................................8

    IV.  Plaintiffs challenge 4 different ingredients and processes that serve differing purposes and are subject to different analyses......................9

    V.   Plaintiffs' Testimony Confirms The Lawyer-Driven Nature of the Lawsuit ...............................................................................................10

ARGUMENT ......................................................................................11

    I.    Plaintiffs' Proposed Classes Are Not Ascertainable Under Rule 23(a)...................................................................................................12

          A.   There is no ascertainable class because the proposed class includes all purchasers, including people who never suffered any injury ..................................................................................12

                1.   The class includes people for whom "all natural" was not a purchasing factor ...................................................13

                2.   The class includes those who believe Bear Naked foods are "100% natural" Products under their own varying definitions of "natural."....................................17

                3.   The class includes those who suffered no harm because they would have paid the same or higher price for alternative products ..................................................18

          B.   There is no ascertainable class because Plaintiffs have not offered any practical mechanism for determining membership..............................................................................19

i

II.     The Proposed Class May Not Be Certified Because There Is No
        Commonality and Individual Issues Predominate ..............................21

        A.     Plaintiffs challenge 11 products made with various
               combinations of four different ingredients and processes ........22

        B.     Plaintiffs' claims require individual analysis of consumer
               perception and reliance ...........................................................24

        C.     Restitution and damages issues are subject to individualized
               inquiries................................................................................27

               1.     Calculating what each consumer paid for each Bear
                      Naked product would be exceedingly complex and
                      would require individualized analysis............................30

               2.     It will be virtually impossible to determine the
                      "substitute" product that each class member would
                      have purchased and the price she would have paid........31

        D.     Common issues do not predominate because the Court
               would have to apply the laws of 50 states ................................35

III.    Plaintiffs' claims are not typical of the claims of the class.................37

IV.     Plaintiffs would not fairly and adequately represent the class............39

CONCLUSION........................................................................................43

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Beck v. Status Game Corp.*,
   No. 89-2923, 1995 WL 422067 (S.D.N.Y. July 14, 1995) ................................41

*Berger v. Compaq Computer Corp.*,
   257 F.3d 475 (5th Cir. 2001) ........................................................................40

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008).......................................................................................30

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ...................................................................21, 37

*Bruno v. Eckhart Corp.*,
   280 F.R.D. 540 (C.D. Cal. 2012).................................................................37

*Burdick v. Union Sec. Ins. Co.*,
   No. 07-4028, 2009 WL 4798873 (C.D. Cal. Dec. 9, 2009) ...............................12

*Burkhalter Travel Agency v. Specialty Food Distributors, Inc.*,
   141 F.R.D. 144 (N.D. Cal. 1991).................................................................41

*Butterworth v. Quick & Reilly, Inc.*,
   171 F.R.D. 319 (M.D. Fla. 1997) .................................................................40

*Chin v. Gen. Mills, Inc.*,
   No. 12-2150, 2013 WL 2420455 (D. Minn. June 3, 2013) ...............................23

*In re Chiron Corp. Sec. Litig.*,
   No. 04-4293, 2007 WL 4249902 (N.D. Cal. Nov. 30, 2007)............................41

*Cleary v. Philip Morris*,
   265 F.R.D. 289 (N.D. Ill. 2010).......................................................................38

*Cohen v. DirecTV*,
   178 Cal. App. 4th 966 (2009) ...........................................................24, 25, 26

*Colapinto v. Esquire Deposition Servs., LLC*,
   No. 09-7584, 2011 WL 913251 (C.D. Cal. Mar. 8, 2011) .................................13

*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006) ............................................................................28

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013)..............................................................................27, 28

*Davis-Miller v. Auto. Club of S. Cal.*,
   201 Cal. App. 4th 106 (2011) ...........................................................................27

*Diacakis v. Comcast Corp.*,
   No. 11-3002, 2013 WL 1878921 (N.D. Cal. May 3, 2012) ..................13, 16, 17

*Dietz v. Comcast Corp.*,
   No. 06-6352, 2007 U.S. Dist. LEXIS 53188 (N.D. Cal. July 11, 2007)............20

*Dumas v. Albers Med., Inc.*,
   No. 03-640, 2005 U.S. Dist. LEXIS 33482 (W.D. Mo. Sept. 7, 2005)..............19

*Espenscheid v. Directstat USA*,
   705 F.3d 770 (7th Cir. 2013) ............................................................................30

*Fine v. ConAgra Foods, Inc.*,
   No. 10-1848, 2010 WL 3632469 (C.D. Cal. Aug. 26, 2010) .......................12, 14

*Garcia v. Sun Pac. Farming Coop., Inc.*,
   359 F. App'x 724 (9th Cir. 2009) .....................................................................39

*Gen. Tel. Co. v. Falcon*,
   457 U.S. 147 (1982)...........................................................................................37

*Gianino v. Alacer Corp.*,
   846 F. Supp. 2d 1096 (C.D. Cal. 2012) ...................................................35, 36, 37

*In re Goldchip Funding Co.*,
   61 F.R.D. 592 (M.D. Pa. 1974) ........................................................................40

*Google Adwords Litig.*,
   No. 08-3369, 2012 WL 28068 (N.D. Cal. Jan. 5, 2012) ..................29, 30, 34, 35

*Heffelfinger v. Elec. Data Sys. Corp.*,
   No. 07-101, 2008 WL 8128621 (C.D. Cal. Jan. 7, 2008)...................................12

Bear Naked, Inc.'s Opposition to Plaintiffs' Motion for Class Certification
Case No. 11-cv-2890-H-BGS

*Hodes v. Van's International Foods,*
 No. 09-1530, 2009 WL 2424214 (C.D. Cal. July 23, 2009) ........................19, 31

*Ivie v. Kraft Foods Global, Inc.,*
 No. 12-2554, 2013 WL 685372 (N.D. Cal. Feb. 2013)......................................23

*Johnson v. Harley-Davidson Motor Co. Group, LLC,*
 285 F.R.D. 573 (E.D. Cal. 2012)...........................................................24, 26, 34

*Kassover v. Computer Depot, Inc.,*
 691 F. Supp. 1205 (D. Minn. 1987).....................................................................40

*Kelley v. Mid-Am. Racing Stables,*
 139 F.R.D. 405 (W.D. Okla. 1990) ...............................................................40, 41

*Konik v. Time Warner Cable,*
 No. 07-763, 2010 WL 8471923 (C.D. Cal. Nov. 24, 2010) .........................17, 26

*Kowalsky v. Hewlett-Packard Co.,*
 No. 10-2176, 2012 WL 892427 (N.D. Cal. Mar. 14, 2012) ...............................37

*Krim v. pcOrder.com,*
 210 F.R.D. 581 (W.D. Tex. 2002) ......................................................................40

*Lanovaz v. Twinings N. Am., Inc.,*
 No. 12-2646, 2013 WL 2285221 (N.D. Cal. May 23, 2013 ...............................23

*Major v. Ocean Spray Cranberries, Inc.,*
 No. 12-3067, 2013 WL 2558125 (N.D. Cal. June 10, 2013) .......................22, 39

*Martinez v. Welk Grp., Inc.,*
 No. 09-2883, 2012 WL 2888536 (S.D. Cal. July 13, 2012)...............................38

*Mazur v. eBay Inc.,*
 257 F.R.D. 563 (N.D. Cal. 2009)........................................................................12

*Mazza v. Am. Honda Motor Co.,*
 666 F.3d 581 (9th Cir. 2012) ..........................................................26, 35, 36, 37

*McLaughlin v. Am. Tobacco Co.,*
 522 F.3d 215 (2d Cir. 2008) ...............................................................................30

*Moheb v. Nutramax Labs. Inc.*,
  No. 12-3633, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012)...................... *passim*

*O'Connor v. Boeing N. Am., Inc.*,
  184 F.R.D. 311 (C.D. Cal. 1998)........................................................................19

*Ogden v. Americredit Corp.*,
  225 F.R.D. 529 (N.D. Tex. 2005)......................................................................41

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) .............................................................13, 14, 26

*Peterson v. Cellco P'ship*,
  164 Cal. App. 4th 1583 (2008) ...........................................................................29

*Pfizer Inc. v. Superior Court*,
  182 Cal. App. 4th 622 (2010) ......................................................................25, 26

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
  214 F.R.D. 614 (W.D. Wash. 2003) ..............................................................20, 21

*Pom Wonderful LLC Mktg. & Sales Practices Litig.*,
  No. 10-2199, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012)..............................37

*In re Quintus Secs. Litig.*,
  148 F. Supp. 2d 967 (N.D. Cal. 2001).................................................................39

*Red v. Kraft Foods, Inc.*,
  No. 10-1028, 2012 WL 8019257 (C.D. Cal. Apr. 12, 2012)............20, 29, 34, 35

*Ries v. Ariz. Beverages USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012).........................................................................29

*Rolex Emps. Retirement Trust v. Mentor Graphics Corp.*,
  136 F.R.D. 658 (D. Or. 1991).......................................................................40, 41

*Sanders v. Apple, Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009).................................................................13

*Schwartz v. Lights of Am.*,
  No. 11-1712, 2012 WL 4497398 (C.D. Cal. Aug. 31, 2012).............................35

*Sevidal v. Target Corp.*,
   189 Cal. App. 4th 905 (2010) ............................................................... 19

*Shein v. Canon U.S.A., Inc.*,
   No. 08-7323, 2010 U.S. Dist. LEXIS 91160 (C.D. Cal. Aug. 10, 2010) ........... 26

*Shiring v. Tier Techs., Inc.*,
   244 F.R.D. 307 (E.D. Va. 2007) ................................................... 40, 41

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ............................................................ 27

*True v. Am. Honda Motor Co.*,
   520 F. Supp. 2d 1175 (C.D. Cal. 2007) ................................................. 27

*True v. Conagra Foods Inc.*,
   No. 07-770, 2011 WL 176037 (W.D. Mo. Jan. 4, 2011) ........................... 19

*Tucker v. Pac. Bell Mobile Servs.*,
   208 Cal. App. 4th 201 (2012) ............................................................ 26

*Turner v. A. B. Carter, Inc.*,
   85 F.R.D. 360 (E.D. Va. 1980) ........................................................... 39

*Utility Consumers' Action Network v. Sprint Solutions, Inc.*,
   259 F.R.D. 484 (S.D. Cal. 2009) ........................................................ 37

*Wal-Mart Stores, Inc. v. Dukes*
   131 S. Ct. 2541 (2011) ............................................................... 11, 21

*Weiner v. Snapple Beverage Co*,
   2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ...................................... 34, 35

*Weisman v. Darneille*,
   78 F.R.D. 669 (S.D.N.Y. 1978) .......................................................... 40

*Welling v. Alexy*,
   155 F.R.D. 654 (N.D. Cal. 1994) ........................................................ 41

*Xavier v. Philip Morris USA Inc.*,
   No. 10-2067, 2011 WL 1464942 (N.D. Cal. Apr. 18, 2011) ....................... 12

*In re Yasmin & Yaz Mktg., Sales Practices & Prods. Liab.,*
    No. 09-2100, 2012 WL 865041 (S.D. Ill. Mar. 13, 2012)....................32

*Zinser v. Accufix Research Institute, Inc.,*
    253 F.3d 1180 (9th Cir. 2001) ..........................................37

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(3)....................................................21

Fed. R. Civ. P. 23(b)(3)(D).................................................37

7 C.F.R. § 205.605.......................................................5, 9

58 Fed. Reg. 2302, 2407 (Jan. 6, 1993)......................................6

Bear Naked, Inc.'s Opposition to Plaintiffs' Motion for Class Certification
Case No. 11-cv-2890-H-BGS

**INTRODUCTION**

In their motion for class certification, Plaintiffs present their lawsuit as a seductively simple case in which the Court only needs to determine if a Bear Naked product is "100% natural" or not. In reality, this action implicates a complex permutation of scientific, consumer behavior, and marketing issues, and will be virtually impossible to decide on a class-wide basis.

This lawsuit challenges 11 different Bear Naked products, ranging from Peak Protein Original Granola to the Soft-Baked Double Chocolate Granola Cookies. Not surprisingly, consumer perceptions and expectations for, say, an indulgent chocolate cookie are different than for a more health-oriented trail mix product. Accordingly, the products vary dramatically in their marketing and packaging. Plaintiffs also object to four different ingredients and processes that require vastly different analysis to determine if they are "natural" or not. One is a vitamin (tocopherols), others are not ingredients but rather processes (*e.g.*, use of hexane to remove fat from soy proteins), and others are completely different altogether. Moreover, three of the four are expressly authorized to be included in organic food products.

As the Supreme Court emphasized in *Wal-Mart v. Dukes*, a plaintiff must provide evidence — and not mere argument — that they have met the requirements of Rule 23(a) and (b) and that the case can be tried on a class-wide basis. Plaintiffs have not met that burden, and their motion must be denied for the following reasons:

<u>First</u>, Plaintiffs have not satisfied Rule 23(a)'s prerequisite that the class be ascertainable and that every class member has suffered an actual injury. Their proposed class of *all* purchasers of Bear Naked products since 2007 likely includes hundreds of thousands of consumers who have not suffered any harm, including:

- **Consumers for whom "100% natural" was not a factor in purchasing Bear Naked products:** Plaintiffs' testimony, as well as consumer studies, reveals that many people buy Bear Naked products for reasons unrelated to the "100%

natural" labeling. Some buy them because of their taste, their premium ingredients (*e.g.*, whole grains), their healthful attributes (*e.g.*, no high fructose corn syrup, high protein content), or some other reason. Professor Itamar Simonson of Stanford University conducted a study in which consumers were shown Bear Naked (and Kashi) products with and without the "100% natural" labeling. He found that the "100% natural" labels have "virtually no impact" on consumers' decisions to purchase the Bear Naked products; in fact, less than 10% mentioned "all natural" or lack of artificial ingredients as a factor they would consider in buying the products.

- **Consumers who believe that Bear Naked products are "100% natural" under their varying definitions of "natural":** There is no consensus among consumers, government regulators, scientists, or the food industry on what "natural" means. For some consumers, Bear Naked products qualify as "all natural" under their definitions. Such persons therefore have not been deceived by the "all natural" labeling and suffered no harm, but they are still swept into the proposed classes.

Second, Plaintiffs have failed to demonstrate that this case can be resolved in "one stroke" as required under the Rule 23(a) commonality standard. And Plaintiffs certainly have not met Rule 23(b)(3)'s more demanding requirement that common issues predominate over individual ones. To the contrary, this Court will have to delve into mini-trials to examine: (a) each class member's differing expectations for each product, (b) different packaging and marketing for each product, (c) whether a particular ingredient is "natural," (d) whether the amount of allegedly artificial ingredients, with some products having as little as 0.003%, renders a product non-natural, (e) the different definitions of "natural,"; and (f) finally, taking into account all the above factors, whether a specific product can be deemed "all natural." The answer to a question for a particular product or issue does not necessarily resolve it for another

product or issue; for example, the Court may find that glycerin is "natural" because it is the chemical equivalent of something that exists in nature, but that does not resolve whether, say, potassium carbonate, a leavening agent similar to baking powder, is "natural."

Further, as the Supreme Court recently emphasized in *Comcast v. Behrend*, plaintiffs must provide both a methodology and evidentiary support showing that damages can easily be calculated on a class-wide basis. Here, Plaintiffs have not offered *any* methodology or evidence. Plaintiffs seek restitution based on a supposed "price premium" that they paid for the "100% natural" labeling on Bear Naked goods. Calculating that "price premium" will require this Court to determine (i) how much each consumer paid for each Bear Naked product, and (ii) what the alternative food product that each consumer would have purchased in lieu of Bear Naked products had he/she known about Bear Naked's ingredients. But it will be nearly impossible to determine the amount paid for Bear Naked products because most consumers do not retain receipts for low-cost food items and they generally cannot recall the details of such purchases. A sample of Los Angeles stores shows that the price of the same Bear Naked product varies between 19% to 72%, depending on where it was purchased and whether there was a sales promotion. And determining what "substitute" product each consumer would have purchased is an even more difficult task because there are dozens of potentially comparable products. Plaintiffs have not offered any method for this Court to determine the appropriate "substitute" product for each consumer. The variation in pricing for the substitute products is also extreme, with some being cheaper than Bear Naked products and others being significantly more expensive.

Finally, Plaintiffs are neither adequate nor typical representatives for the proposed class members. While Mr. Knowles testified that he probably would have purchased Bear Naked granola even if it was not labeled "100% natural," Ms. Thurston is a hypersensitive plaintiff who purchased Bear Naked granola *solely*

because it was labeled as natural and who now makes her own granola because no truly "all natural" alternative is available.  Plaintiffs are also atypical of the class they seek to represent because they purchased different products than the putative class members.  None of them purchased any Bear Naked cookie or trail mix products, yet they purport to represent those who did.  Finally, confirming that they are mere figureheads for their lawyers, Plaintiffs know virtually nothing about the challenged ingredients, including whether they are natural or if they are included in Bear Naked products.

## FACTUAL BACKGROUND

### I.    Bear Naked's Food Products and Philosophy.

Bear Naked makes a variety of "tasty foods that [provide] energy," (Ex. 1 at 124:7-10) and do not contain ingredients that consumers generally try to avoid.  For example, Bear Naked foods do not contain any artificial flavors, artificial coloring, high fructose corn syrup, or hydrogenated oil. *Id.* at 37:20-24.  And to further meet consumer expectations about "natural" food products, Bear Naked has complied with (and in many cases goes beyond) every requirement of the Whole Foods' public list of unacceptable ingredients, which is widely regarded by the industry and consumers as the touchstone for acceptable natural food ingredients. *See* Ex. 2; Ex. 1 at 82:15-17, 83:3-15.[1]

In addition to avoiding ingredients that consumers perceive as unhealthy, Bear Naked strives to include premium and nutritious ingredients.  Compared to non-natural as well as other "all natural" products, Bear Naked typically includes more premium ingredients (*e.g.*, whole grains, flax seeds), more healthy nutrients (*e.g.*, protein, Omega-3s), and fewer less desirable ingredients (*e.g.*, high fructose corn syrup, cholesterol, hydrogenated oils).  Numerous surveys show that consumers seek out and

---

[1]  Demonstrating how widely-recognized Whole Foods' list is, a Google search for Whole Foods Unacceptable Ingredients for Food turns up about 764,000 results.

4

are willing to pay more for foods with these attributes. Ex. 3 at 21 & ¶ 81; *see also* Ex. 1 at 55:7-14, 95:3-5, 123:20-124:1, 152:7-11; Ex. 4 at 68:24-69:4; Ex. 5 at 29:11-23, 31:18-32:10.

Bear Naked also describes its food philosophy on its packaging, explaining: "real food is important for the energy you need to make the journey. That's why we craft our trail mixes with ingredients that provide energy from natural sources. Each blend is packed with luscious fruit, nutrient rich seeds, hearty nuts and granola clusters." *E.g.*, Ex. 21; *see also* Ex. 8.   Further, the packaging of its granola and trail mix products, for example, highlights Bear Naked's understanding of natural: "NO High Fructose Corn Syrup, NO Artificial Preservatives, NO Artificial flavors, NO cholesterol, NO Hydrogenated Oils, NO 0g Trans Fat." Ex. 21; *see also* Ex. 8. And every Bear Naked label lists the product's "***BEARLY   PROCESSED*** INGREDIENTS," highlighting to consumers that, although Bear Naked sells minimally processed food products, its products *are* processed. *E.g.*, Exs. 7, 8, 21.

Despite these good-faith efforts to sell healthy foods, Plaintiffs claim that Bear Naked has misled consumers because some of its products contain one or more of the two allegedly artificial ingredients and two supposedly synthetic processes. Plaintiffs essentially engage in semantics:  They use a complex scientific term for a particular ingredient to falsely suggest that it is artificial (*e.g.*, tocopherols is Vitamin E).

Notably, three of the four "artificial" components are expressly allowed in certified "organic" goods. *See* 7 C.F.R. § 205.605(b).[2]  Consumers correctly "hold organic to be an even higher standard than natural," yet Plaintiffs insist these ingredients cannot be included in "natural" products.  Ex. 1 at 112:18-20, 113:19-25; *see also* Ex. 3 ¶ 74.   But even assuming these ingredients were non-natural, the percentage of those ingredients in Bear Naked's products is miniscule, ranging from less than .003% to around 5% in weight. Ex. 10. Plaintiffs are thus literally making a

_____

[2] They are glycerin, tocopherols, and potassium carbonate.

federal case out of an allegedly artificial ingredient that accounts for less than one-hundredth of one percent of a product's weight.

## II.    The term "natural" is not susceptible to a single, uniform definition.

This class action lawsuit alleges that consumers across the country were misled by the term "100% natural." But as the FDA has recognized, consumers, food industry experts, and scientists espouse widely divergent views about the meaning of the term "natural" when used to describe food products. *See* 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993). The FDA ultimately declined to define "natural" because of the variation of definitions offered by consumers, experts, and scientists. *See id.* (noting that commentators "provided a wide range of ideas" regarding the definition of natural).

Numerous surveys have demonstrated that different consumers have different understanding of the term "natural." ██████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████ Ex. 12 at K0000374 (emphasis added).[3]  In addition, consumers maintain differing views regarding the percentage of natural ingredients necessary to constitute a "natural" food product. ███████████████████████████ ███████████████████████████████████████████████████ ██████████ *Id.* at K000384.  Further, consumers are generally confused by the term "natural." Ex. 12 at K0000376██████████████████████████████████ ███████████████████████████████████

As a result of this divergence and confusion over the term "natural," consumers afford little credence to "natural" product labeling.   According to a 2011 study produced by Plaintiffs, only 4% of natural consumers consider themselves "very" confident in natural labeling, with only 39% even "somewhat" confident in such labeling. Ex. 13 at KPLAINTIFFS001559.  Conversely, one in three consumers was

---

[3] Exhibits 1-28 are attached to the concurrently-filed Declaration of Kenneth K. Lee.

"not very" or "not at all" confident in natural labeling. *Id*; *see also* Ex. 14 at K0000685 (only 33% of consumers trust the term "natural" on labels). In short, consumers "see 'natural' as a marketing term, meaningless alone, that may encourage them to investigate the product more, but is not enough by itself." Ex. 15 at K0000571. Even among natural consumers, they consider "all natural" to be less important than a food's nutritional benefit, taste, ingredient list, and sales price. Ex. 13 at KPLAINTIFFS001547-48; *see also* Ex. 12 at K0000378███████████████████████████████████████████████████████████████████████████████████████████████████████████

It is not just the consumers who fail to have a uniform definition of "natural." Food industry leaders as well as scientists espouse similarly divergent views regarding the definition of "natural" foods. ████████████████████████ ████████████████████████████████(Ex. 16 at K0010926),████████ ████████████████████████ (*id.* at K0010977), ████████████ ████████████████████ (*id.* at K0010951), and ████████████████ ██████████████████(*id.* at K0011163). ████████████ ██████████████████████████████████████ ████████████████████████████████████████ *Id.* at K0011188. ██████████████████████████ ████████████████████████████████████████ ████████████ *Id.* at K0010954.

Not surprisingly, Plaintiffs in this case do not share a single, consistent view of the meaning of "all natural," either. For example, Mr. Babic believes that to be "all natural," a food product must be completely "unprocessed." Ex. 4 at 116:4-19, 147:10-13. In contrast, Mr. Knowles believes that a product may properly be labeled "all natural" if it is made of ingredients "occurring in or to be found in nature." Ex. 5

at 109:5-12.  And a food product violates Ms. Thurston's definition of "all natural" if it includes an additive that is *either* man-made *or* harmful (even if natural).  Ex. 6 at 54:22-55:21.  In sum, there is no common definition of "natural" because different consumers — as well as industry leaders and scientists — ascribe different meanings to that term.

## III.   Plaintiffs challenge 11 different products that have been marketed differently and feature different packaging.

As set forth above, the meaning of "natural" is not a simple, straightforward issue, and depends on who is asked.  Moreover, this lawsuit challenges 11 different products — ranging from cereal to cookies to trail mix — involving 4 different challenged ingredients and processes.  The breadth of the food products at issue ensures that there will be individualized differences.

For example, a consumer's expectations and motivations for purchasing, say, Pecan Apple Flax Trail Mix will almost certainly be different than for Soft-Baked Double Chocolate Granola Cookies.  *See* Ex. 3 ¶ 68

Further, what constitutes a "natural" trail mix in the minds of consumers is likely quite different from a "natural" chocolate cookie.  And even within the same category of food products, there are substantial differences: For example, a more indulgent type of cereal (*e.g.*, Heavenly Chocolate Granola) cannot be equated with Cluster Crunch Honey Almond Cereal.  And Bear Naked products are marketed differently.  For example, the Peak Protein Original Granola is marketed as including a high protein content (Ex. 17), while the Double Chocolate Granola cookies are geared towards providing a tasty treat that is healthier than many alternatives because it is made with whole grains (Ex. 18).

## IV. Plaintiffs challenge 4 different ingredients and processes that serve differing purposes and are subject to different analyses.

Another complicating factor is the diversity of ingredients being challenged. Plaintiffs do not distinguish between the 4 ingredients and processes, and instead treat them as a homogenous set of ingredients. In reality, they represent a wide-ranging set of ingredients and processes that play different roles in the Bear Naked products.

First, although Plaintiffs claim to be challenging "ingredients" only, they are in fact also challenging processes by which ingredients are developed. For example, they challenge "hexane-processed soy ingredients," but they are not objecting to soy ingredients. Rather, they are complaining about the use of hexane in the production of soy products, even though it does not remain in the final product. Hexane is merely a processing aid that is washed out of the soy and detected in finished food products at "less than one part per million." Ex. 1 at 67:12-68:5. Plaintiffs similarly object to the use of potassium carbonate in the production of alkalized cocoa. Compl. ¶ 26. This distinction is significant, as Plaintiffs have adduced no evidence that consumers evaluate ingredients and processing methods in the same manner.

Second, the ingredients vary in their composition and purpose. One of Plaintiffs' objections is to vitamin E (tocopherols) in Bear Naked products. The tocopherols have the same chemical compositions as so-called "natural" vitamin E, and have long been used in natural food products to satisfy the expectations of health-conscious consumers. Ex. 19 ¶ 2. Plaintiffs also challenge glycerin, which Plaintiffs concede exists in nature (Compl. ¶ 23), and is used to maintain moisture and improve shelf stability (Ex. 19 ¶ 5). Both of these ingredients (as well as potassium carbonate), are expressly permitted in certified organic products. 7 C.F.R. § 205.605(b). Reasonable consumers have differing views regarding the use of these varying ingredients and processes in products labeled "all natural." *See* Ex. 3 ¶ 98.

Third, while Plaintiffs acknowledge that many of the challenged ingredients were clearly disclosed on the ingredients panel of the products, they claim product labels failed to disclose the inclusion of hexane-processed soy ingredients. *See* Compl. ¶ 3. The question of whether a consumer who purchased a product containing glycerin (which was clearly disclosed on the product packaging) was deceived would be different from a consumer who purchased a product containing hexane-processed soy ingredients (allegedly not disclosed on the product packaging).

## V.   Plaintiffs' Testimony Confirms The Lawyer-Driven Nature of the Lawsuit.

Plaintiffs' deposition testimony underscores that this class action lawsuit has been largely manufactured by lawyers. The Amended Complaint states that Plaintiffs purchased Bear Naked products because of the "100% natural" labeling, but several of the Plaintiffs testified that they purchase non-natural foods, such as potato chips, chocolate bars, and Lucky Charms. Plaintiffs' testimony also highlighted that each has different understanding of the term "natural."

Milan Babic. He was "approach[ed]" by an acquaintance "about bringing this lawsuit." Ex. 4 at 184:14-185:2. He does not recall the names of a single packaged food product he currently buys, and does not know whether they are "all natural." *Id.* at 30:21-31:1, 31:25-32:23, 35:5-10, 50:16-51:8, 53:8-21, 54:22-55:15, 94:7-97:17, 178:24-180:11, 199:10-200:2. He drinks diet soda three times a week (which includes artificial ingredients) and has purchased chocolate 50 times in the past year from stores such as CVS, as well as potato chips from sandwich shops and vending machines. *Id.* at 22-45:4, 53:3-54:6. Mr. Babic considers a variety of factors in deciding which food products to purchase, such as taste, fiber content, protein content, cholesterol content, and the presence or absence of high fructose corn syrup. *Id.* at 158:17-19, 160:21-161:12,167:7-169:4, 172:12-23. Under his definition, to be "all natural," a food product must be completely "unprocessed." *Id.* at 116:4-19, 147:10-13.

<u>Chanee Thurston.</u>  She has been a named plaintiff in four prior class action lawsuits filed by her attorneys in this case. Ex. 6 at 107:4-110:1.  She purchases all natural products because her pediatrician advised her to do so in light of her son's learning disabilities.  *Id.* at 10:22-11:12.  While Ms. Thurston claimed that she purchased Bear Naked granola solely "because it said it was pure and natural" and that "[t]here was no other deciding factors," (*id.* at 12:16-22, 73:18-19), she admitted she has purchased non-natural products during the class period, such as Go-Gurt, Lucky Charms, and Cheerios. *Id.* at 48:15-49:1, 103:23-104:13.  A food product violates Ms. Thurston's personal definition of "all natural" if it includes an additive that is *either* man-made *or* harmful (even if natural).  *Id.* at 54:22-55:21.

<u>Lawrence Knowles.</u>  He was asked to join this lawsuit over dinner with a relative, who is a member of Stember Feinstein. Ex. 5 at 169:23-171:21.  He considers a variety of factors in purchasing cereal or granola, including "taste, nutritional value, and price," and his decision to purchase Bear Naked granola was informed by its inclusion of nuts, the absence of high fructose corn syrup, the taste, and the fact that it was on sale.  *Id.* at 134:18-25, 136:7-10, 136:24-137:1, 138:4-20, 148:6-13.   Mr. Knowles testified that he "probably" would have bought the Bear Naked granola even if "it didn't say all natural on it."  *Id.* at 141:20-142:1, 142:21-24.   Under Mr. Knowles's definition of "all natural," a product may properly be labeled "all natural" if it is made of ingredients "occurring in or to be found in nature." *Id.* at 109:5-12.

## ARGUMENT

The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes* reiterated that "Rule 23 does not set forth a mere pleading standard," and that the trial court must "probe behind the pleadings" to analyze the factual and legal issues. 131 S. Ct. 2541, 2551 (2011) (requiring "rigorous analysis" to ensure "that the prerequisites of Rule 23(a) have been satisfied").  Under *Wal-Mart*, Plaintiffs bear the burden of "affirmatively demonstrat[ing]," not merely pleading, that certification is proper. *Id.* at 2551-52.

Plaintiffs here have failed to satisfy that burden. They have not offered any support for how the claims could be decided on a class-wide basis and instead rely on conclusory self-serving statements.

## I. Plaintiffs' Proposed Classes Are Not Ascertainable Under Rule 23(a).

### A. There is no ascertainable class because the proposed class includes all purchasers, including people who never suffered any injury.

Federal courts have held that "an implied prerequisite to class certification is that the class must be sufficiently definite," and that "the party seeking certification must demonstrate that an identifiable and ascertainable class exists." *Xavier v. Philip Morris USA Inc.*, No. 10-2067, 2011 WL 1464942, at *12 (N.D. Cal. Apr. 18, 2011); *see also Heffelfinger v. Elec. Data Sys. Corp.*, No. 07-101, 2008 WL 8128621, at *5 (C.D. Cal. Jan. 7, 2008) ("Although not specifically mentioned in Rule 23(a), there is an additional prerequisite to certification—that the class be ascertainable.").

A key requirement of an ascertainable class is that it must "be defined in such a way that anyone within it would have standing." *Burdick v. Union Sec. Ins. Co.*, No. 07-4028, 2009 WL 4798873, at *4 (C.D. Cal. Dec. 9, 2009). "The class description must be sufficiently definite to permit ascertainment of class members, and the description must not be so broad as to include individuals who are without standing to maintain the action on their own behalf." *Heffelfinger*, 2008 WL 8128621 at *9. As one court put it, a proposed class that includes "non-harmed" class members "is both imprecise and overbroad." *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).

Federal courts in the Ninth Circuit accordingly have denied certification of UCL, CLRA, and FAL claims that define the class as *all* purchasers of a given product because such a class would likely include individuals who did not rely on a misrepresentation and thus suffered no harm. In other words, if the proposed class includes people who were not injured, then the class is overly broad and unascertainable. For example, in *Fine v. ConAgra Foods, Inc.*, plaintiff alleged that

ConAgra falsely represented that its microwave popcorn no longer included diacetyl. No. 10-1848, 2010 WL 3632469, at *1 (C.D. Cal. Aug. 26, 2010).  Like Plaintiffs in this case, plaintiff in *ConAgra* sought to certify a class of *all* purchasers of the popcorn, regardless of whether they saw or relied on the supposedly false statement. *Id.* at *2.  The proposed class was deemed unascertainable because it improperly "include[d] many people who may not have relied on Defendant's alleged misrepresentations when making their purchasing decisions" and, thus could not have been injured as a result of those representations.  *Id.* at *3 ("Class definitions 'should be tailored to exclude putative class members who lack standing.'").[4]

Other Circuits have similarly held that a class is unascertainable if it includes consumers who were never exposed to or cared about the alleged misrepresentations. In *Oshana v. Coca-Cola Co.*, plaintiffs claimed that Coca-Cola misleadingly suggested that its fountain Diet Coke did not contain saccharin, and sought to certify *all* purchasers of that drink.  472 F.3d 506, 509 (7th Cir. 2006).  The Seventh Circuit held that the class was unascertainable because it "could include millions who were not deceived [by the alleged misrepresentations] and thus have no grievance."  *Id.* at 514. The court further observed that "[s]ome people may have bought fountain Diet Coke

---

[4] *See also, e.g., Moheb v. Nutramax Labs. Inc.*, No. 12-3633, 2012 WL 6951904, at *3 (C.D. Cal. Sept. 4, 2012) (class of all purchasers of Cosamin not ascertainable because it would "include members who derived benefit from Cosamin and are satisfied users of the product"); *Diacakis v. Comcast Corp.*, No. 11-3002, 2013 WL 1878921, at *4 (N.D. Cal. May 3, 2012) (following *Oshana v. Coca-Cola* and holding class was overbroad because it included every purchaser of a particular product, "irrespective of whether he or she was deceived by Comcast's alleged failure to disclose"); *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) (class definition of "all persons . . . who own a 20-inch Aluminum iMac" was improper as it "necessarily includes . . . individuals who either did not see or were not deceived by [Apple's] advertisements, and individuals who suffered no damages"); *Colapinto v. Esquire Deposition Servs., LLC*, No. 09-7584, 2011 WL 913251, at *4 (C.D. Cal. Mar. 8, 2011) (not certifying a class of all persons who were overcharged by court reporters because it included lawyers who were reimbursed by their clients and thus suffered no injury).

13

*because* it contained saccharin, and some people may have bought fountain Diet Coke *even though* it had saccharin." *Id.*

Plaintiffs' proposed class suffers from the same fatal flaw as those in *ConAgra*, *Oshana* and other similar cases. This lawsuit is *not* the typical class action case involving a defective item, a product that caused identifiable physical harm, or a product that simply failed to perform as promised. In such suits, it is relatively straightforward to identify the people who were harmed and define the class accordingly. Here, there is no allegation that Bear Naked food products caused any physical harm or that they did not taste or perform as one would reasonably expect. Rather, this lawsuit is based on allegedly deceptive "100% natural" statements found on the packaging of Bear Naked products. Yet the proposed class is not limited to people who believed "100% natural" was deceptive, saw that term, relied upon it, cared about it, or who shared the same definition of "natural." Rather, the proposed classes consist of "[a]ll persons who purchased Bear Naked Inc.'s food products in the United States on or after September 21, 2007 that were labeled '100% Pure & Natural' or '100% Natural' . . ." Dkt. No. 73 at 1. This proposed classes of *all* consumers therefore includes a gamut of individuals who never suffered any harm, including the following consumers:

1. The class includes people for whom "100% natural" was not a purchasing factor.

The proposed class is overbroad and indefinite because it includes thousands of consumers who bought Bear Naked products for reasons unrelated to the "100% natural" labeling, such as their taste or the use of premium ingredients. These consumers were not deceived by the term "100% natural," would have purchased the Bear Naked products irrespective of the labeling, and therefore have not suffered any harm. Yet they are included as members of the proposed classes.

As shown in Dr. Simonson's report, ██████████████████████
████████████████████████5 ██████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ Ex.
3 ¶ 16, 25. ████████████████████████████████████████████████
██████████████████████████████████ *Id.* ¶¶ 52-66.
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████ *Id.* at 21,
Table 7. ████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████ *Id.* ████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
*See id.* ████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████ *Id.* at 23, Table 12.
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████ *See id.* ████████████████████████████
██████████████████████████████████████████████████████████

---

5    Dr. Simonson, the Sebastian S. Kresge Professor of Marketing at Stanford University's Graduate School of Business, is an expert in consumer behavior who has twice won the *Journal of Marketing Research*'s O'Dell Award, which is given for an article that has the greatest impact on the marketing field.

1

██████████████████████████████████████████████████

2  ████████████████████████ *Id.* ¶ 45.

3      These results are not surprising because Bear Naked markets many of its

4  products by highlighting their premium ingredients or other attributes, and not their

5  "natural" aspect. For example, the front label of Bear Naked's chocolate cookies calls

6  out the fact that, unlike other cookies, they are made with "10 grams whole grains."

7  Ex. 18. Other Bear Naked labels emphasize the products' inclusion of protein, flax, or

8  Omega-3s. Exs. 17, 22, 23.

9

██████████████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 ████████████████████████████████ Ex. 3 ¶13(I).  For example, Mr. Knowles

12 testified that he probably would have purchased Bear Naked granola even if it was not

13 labeled "100% natural." Ex. 5 at 141:20-142:1. Similarly, a consumer who purchased

14 Bear Naked cookies because of their whole grain content or to avoid consuming high

15 fructose corn syrup — and not because the product was "100% natural" — would not

16 have been harmed by the inclusion of glycerin and therefore cannot be included in the

17 class. *See Moheb*, 2012 WL 6951904, at *3 (class not ascertainable because it would

18 "include members who derived benefit from Cosamin and are satisfied users of the

19 product").

20      The overbreadth of Plaintiffs' proposed class is perhaps best highlighted by the

21 fact that it includes about one-third of the population that, according to consumer

22 surveys, do not trust "all natural" labeling and view it as marketing puffery. *See* Ex.

23 14 at K0000685. ██████████████████

24 ██████████████████ Ex. 3 ¶ 57 (discussing Exs. 12, 15).  This subset of consumers

25 has not suffered any injury because they never believed the "all natural" labeling, yet

26 they are considered members of the class who purportedly were harmed by Bear

27 Naked's alleged mislabeling. *Cf. Diacakis*, 2013 WL 1878921, at *4 (holding class

28

was not ascertainable because it included every purchaser of a particular product, "irrespective of whether he or she was deceived" by defendant's marketing materials).

    2.  <u>The class includes those who believe Bear Naked foods are "100% natural"</u>
<u>Products under their own varying definitions of "natural."</u>

    Plaintiffs' proposed class also impermissibly includes purchasers for whom the Bear Naked products *were* "100% natural" as they or Bear Naked has defined it and, thus, were not injured in any way. ████████████████████████████████████

███████████████████████████ Ex. 3 ¶¶ 35, 56-57. For many consumers, their definition of "natural" permits the challenged ingredients and, thus, as a matter of law, they *could not* have been deceived by the "all natural" label (because it was true for them).

████████████████████████████████████████████████████████████ Ex. 3 ¶¶ 76, 98. ██████████████████████████████ *Id.* ¶ 74. ████████████████████████████████████████████████████████████████████████

██████████████████ Ex. 11. As a matter of law, those 60% of consumers who believe products in organic foods are "natural" could not have been deceived by the inclusion of glycerin in Bear Naked granola or tocopherols in the Nut Cluster Crunch cereal. *See Diacakis*, 2013 WL 1878921, at *4 (proposed class overbroad because it included purchasers who were not deceived); *cf. Konik v. Time Warner Cable*, No. 07-763, 2010 WL 8471923, at *9 (C.D. Cal. Nov. 24, 2010) (certification improper where plaintiffs failed to show "that the challenged statements were actually false as applied to all . . . classmembers [sic]").

    Some consumers believe that a product fortified with (allegedly synthetically processed) vitamins can still be considered "natural." For example, Ms. Tamara Diaz

in the companion Kashi case testified that it is acceptable for ascorbic acid to be included in a product labeled "all natural." Ex. 29 at 147:24-148:8. For such consumers, they have suffered no harm under their definition of "natural."

██████████████████████████████████████████

████████████████████████████████ Ex. 12 at K0000384. ████

██████████████████████████████████████████

███████████████████████████ Ex. 10.[6]

### 3. The class includes those who suffered no harm because they would have paid the same or higher price for alternative products.

Finally, the proposed classes include consumers who suffered no harm because the "substitute" products they would have purchased are *more* expensive than the Bear Naked products. For example, certain products, such as Nature's Path Pumpkin Flax Granola, contain the same allegedly synthetic and artificial ingredients and are actually *more costly* on per ounce basis than Bear Naked granolas. *See* Ex. D.[7] Likewise, Ms. Thurston testified that making her own granola (because she cannot find any "natural" granola she likes as much as Bear Naked granola) is both more time-consuming and more costly than purchasing Bear Naked granola. Ex. 6 at 77:5-14, 101:8-10, 102:21-103:1. The class also includes consumers, such as the roughly 20% of respondents in

---

[6] Plaintiffs' challenge to the term "natural" is different from other false advertising claims because the latter cases typically involve claims which can be easily confirmed or disproved (*e.g.*, a snack actually does or does not have 8g protein, a television offers 1080p resolution or it does not), and thus it is easy to determine whether a consumer has been deceived or not. Here, because there is no commonly accepted definition of natural, different consumers have differing views about what "natural" means, and many of them may not have been deceived at all under their definition of "natural."

[7] Exhibits A-D are attached to the concurrently-filed Declaration of Daniel D. Welsh.

the survey commissioned by Plaintiffs' expert, who are not willing to pay more for a product labeled as "all natural." Ex. 20.[8]

In short, Plaintiffs have failed to meet their "burden to define an ascertainable class" because it includes thousands, if not millions, of individuals who suffered no injury. *See Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 910, 918-22 (2010).

## B. There is no ascertainable class because Plaintiffs have not offered any practical mechanism for determining membership.

Plaintiffs' proposed classes are also unascertainable for a more practical reason — there simply is no feasible way to determine membership in the proposed classes. A class is certifiable only if it is "administratively feasible for the court to ascertain whether an individual is a member." *See O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998); *see also Dumas v. Albers Med., Inc.*, No. 03-640, 2005 WL 2172030, at *5 (W.D. Mo. Sept. 7, 2005) ("The requirement that there be an identifiable class demands more than just an objective definition, and more than just . . . theoretical ascertainability.").

Plaintiffs have not offered *any* mechanism for determining who belongs in the proposed class. Courts have repeatedly denied class certification in similar situations. In *Hodes v. Van's International Foods*, the proposed class was defined to include purchasers of certain varieties of Van's frozen waffles. No. 09-1530, 2009 WL 2424214, at *1 (C.D. Cal. July 23, 2009). The court denied certification in light of "concerns about how Plaintiffs will identify each class member and prove which brand of Van's frozen waffles each member purchased, [and] in what quantity," given that

---

[8]  Plaintiffs' expert commissioned the survey but omitted key results of it from her report – including the fact that 20% of respondents were not willing to pay even *one cent* more for a product labeled "all natural." Apparently, once Plaintiffs discovered that the results of the study were problematic for their class certification request (and numerous flaws in its methodology were exposed), they withdrew it. *See* Dkt. No. 123.

the "likelihood that tens of thousands of class members saved their receipts as proof of their purchase of Van's waffles is very low." *Id.* at *4.

Another court denied certification of a proposed class of "consumers that had purchased . . . turkey and chicken pot pies . . . that bore the number 'P-9' printed on the side of the package" because there was no "master list" of individuals who purchased the pot pies and it was "highly likely that only a few—if any—putative members retained tangible evidence of their purchase." *True v. Conagra Foods Inc.*, No. 07-770, 2011 WL 176037, at *1, 5 (W.D. Mo. Jan. 4, 2011).[9] Here, there is no "master list" identifying those who purchased Bear Naked products. *Cf. id.* at *5. Nor is it likely that most class members "possess any physical proof of purchase," such as receipts. *Cf. In re PPA Prods. Liab. Litig.*, 214 F.R.D. 614, 617 (W.D. Wash. 2003).

███████████████████████████████████████████████████████Ex. 3

¶ ¶¶ 95-96.   "Cases where self-identification alone has been deemed sufficient to render a class ascertainable generally involve situations where consumers are likely to have retained receipts, where the relevant purchase was a memorable bigticket [sic] item, or where the defendant would have access to a master list of either consumers or retailers who dealt with the items at issue." *Red v. Kraft Foods, Inc.*, No. 10-1028, 2012 WL 8019257, at *5 (C.D. Cal. Apr. 12, 2012), *adopted as final in* 2012 WL 8018618 (C.D. Cal. Apr. 26, 2012).   In *Kraft*, plaintiffs sought certification of a class of snack food purchasers on the ground that the labels allegedly represented the

---

[9] *See also Dietz v. Comcast Corp.*, No. 06-6352, 2007 U.S. Dist. LEXIS 53188, at *25-26 (N.D. Cal. July 11, 2007) (proposed class of subscribers with particular TV equipment was not ascertainable because Comcast's records did not identify the types of devices owned by its subscribers); *Moheb*, 2012 WL 6951904, at *8 (class cannot be certified where plaintiff "makes no showing as to how th[e] court will identify the consumers who purchased these products, the amount of [the challenged product] each consumer bought, and for what purpose the [product] was bought").

products as healthier than they were. *Id.* at \*1. The court held that, since none of the factors listed above were present, the class was not ascertainable: "class members w[ould not] be able to identify themselves to the Court in any even remotely verifiable way." *Id.* at \*4, 6.

The same is true here. None of the Plaintiffs retained receipts of their Bear Naked purchases. *E.g.*, Ex. 5 at 69:2-14; Ex. 6 at 67:19-22. Bear Naked foods are not "memorable bigticket [sic] item[s]," either. *Red*, 2012 WL 8019257, at \*5. Nor does Bear Naked have access to a list identifying consumers. Indeed, Plaintiffs themselves had difficulty recalling the type of products they purchased, the number of products they purchased, and the prices they paid. *E.g.*, Ex. 6 at 64:17-22, 78:15-79:7 (Ms. Thurston only remembered buying Bear Naked cereal after being shown images by her attorneys, and her interrogatory and deposition testimony reflected vastly different recollection re number of times purchased). Denial of certification is proper where, as here, membership in a class depends on "the vagaries of memory." *PPA*, 214 F.R.D. at 617.

## II.  The Proposed Class May Not Be Certified Because There Is No Commonality and Individual Issues Predominate.

Rule 23(a)(2)'s commonality requirement "ensure[s] that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). As the Supreme Court made clear in *Wal-Mart*, Plaintiffs must "demonstrate" that the court can resolve "*each one* of the claims in *one stroke*." 131 S. Ct. at 2551 (emphasis added). The Supreme Court further emphasized that Rule 23 does not establish a mere pleading standard, but rather requires the plaintiff to provide evidence that the case can be tried on a class basis. *See id.* at 2551-52.

Here, Plaintiffs have not met their burden of providing evidence that there is a "common" question that can resolve all of the claims in "one stroke." But even if

there were, the proposed class would fail under Rule 23(b)(3), which requires Plaintiffs to establish that common questions *predominate* over individual issues, and "that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added).[10]

### A. Plaintiffs challenge 11 products made with various combinations of four different ingredients and processes.

The claims presented by the various class members cannot be resolved in "one stroke" because of the scope of the Complaint:  It challenges 11 products including a number of combinations of four different ingredients and processes that have been purchased by thousands of consumers in all 50 states for widely varying reasons over several years.  Underscoring the lack of commonality is the fact that, while Plaintiffs purchased three Bear Naked products, they seek to represent purchasers of 11 different products.  Certification is improper where the proposed classes are "so overbroad and indefinite that they encompass products that [Plaintiffs] did not purchase." *Major v. Ocean Spray Cranberries, Inc.*, No. 12-3067, 2013 WL 2558125, at *4 (N.D. Cal. June 10, 2013) (no certification because the "evidence needed to prove" a claim for one product was not probative of claims for other products with different ingredients).

Even if Plaintiffs could represent consumers of products they never purchased, commonality is lacking here because the products in the Complaint differ substantially

---

[10] Plaintiffs' reliance on Professor Elizabeth Howlett, whose opinions rely heavily on a consumer survey she commissioned to study the alleged materiality of "all natural" claims, does not allow them to meet their heavy burden.  At her deposition, Prof. Howlett conceded the numerous flaws in the survey she designed, and thereafter she and Plaintiffs withdrew her survey. Ex. 24 at 116:7-117:18, 124:1-9, 130:6-12, 151:15-153:14).  Without any relevant survey evidence, Prof. Howlett is left with no bases for her opinions because the remaining  generic studies she relies on did not test for the cause and effect relationship between the challenged claims on the actual products and labels at issue.  *See* Ex. 3 ¶¶ 60-66. Plaintiffs' motion thus is devoid of any support for the proposition that there is commonality among consumers in their reasons for purchasing the Kashi and Bear Naked products, and the survey results of Dr. Simonson are unopposed.

in terms of, among other things:

- Types of ingredients (some are vitamins, others are processing aids, some are considered by the federal government to be "natural," etc.).

- Combinations of ingredients (*e.g.*, some include only tocopherols, others include glycerin and potassium carbonate).

- Type of food product (*e.g.*, trail mix vs. cereal vs. cookies vs. granola).

Simply stated, resolving whether the "100% natural" label on one product was misleading would do nothing to assist in determining whether it was misleading as used on another product. Considering the three products purchased by Plaintiffs illustrates the divergent analyses that would need to be conducted to resolve the claims of the class:

- The Heavenly Chocolate Granola purchased by Ms. Thurston does not include *any* of the four ingredients challenged in the Complaint. Exs. 8, 11.[11]

- The Nut Cluster Crunch Cereal bought by Ms. Thurston is made with tocopherols (Vitamin E), which has the same chemical composition as the vitamin it represents. Ex. 9. ███████████████ ███████████ Ex. 10.

- The Fruit and Nut Granola purchased by Mr. Babic and Mr. Knowels includes glycerin, an ingredient that is permitted in certified organic products, ████████████████████ Exs. 7, 10.[12]

---

[11]   The Complaint mistakenly alleges the product includes hexane-processed soy ingredients, but the soy lecithin in the cookies is not made with hexane. Ex. 11.

[12] The significant differences among the products underscore that Plaintiffs lack standing to challenge Bear Naked products that they did not purchase. *Ivie v. Kraft Foods Global, Inc.*, No. 12-2554, 2013 WL 685372, at *5 (N.D. Cal. Feb. 25, 2013); *Chin v. Gen. Mills, Inc.*, No. 12-2150, 2013 WL 2420455, at *3-4 (D. Minn. June 3, 2013) (dismissing claims related to Protein Chewy Bars and Yogurt Chewy Bars for lack of standing even though plaintiffs purchased other varieties of defendant's granola

1   Determining whether it is misleading to label as "100% natural" a chocolate

2   cookie made with glycerin and potassium carbonate ▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮ simply will not resolve whether it is appropriate to label as "100% natural"

4   a cereal containing an allegedly synthetic vitamin (but whose other ingredients, ▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Nor will either

6   scenario assist in resolving whether it is misleading to label as "100% natural" a

7   granola product that includes soy protein that was processed with hexane — but which

8   does not include hexane as an ingredient in the final packaged product (since it is

9   washed out of the soy and detected in finished food products at "less than one part per

10   million"). Ex. 1 at 67:12-68:5.

11   Further, consumers maintain differing views regarding the percentage of natural

12   ingredients that should be included in a "natural" food product. *See* Ex. 12 at

13   K000384 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮ *See* Ex. 3 ¶¶ 76, 98. Finally, consumers have different expectations for

17   different types of food products; consumers understand that certain products (*e.g.,*

18   chocolate cookies) undergo more processing than others (*e.g.,* trail mix).

19   In sum, resolving this lawsuit on a class-wide basis would require the Court to

20   conduct scientific mini-trials for each ingredient (or combination thereof), the results

21   of which could not be applied by the jury because of the differences in consumer

22

23   ───────────────────────────────────

24   bars that included identical "all natural" language); *cf. Lanovaz v. Twinings N. Am.,*
    *Inc.,* No. 12-2646, 2013 WL 2285221, at *3 (N.D. Cal. May 23, 2013) (allowing

25   plaintiffs to challenge varieties of tea they did not purchase only because the products
    bore "the exact same label describing the same [ingredient]" and striking claims

26   related to other varieties of tea with the same "natural" label because they were made
    with a different ingredient and were "thus a significantly different product"). Notably,

27   Plaintiffs do not allege that they purchased *any* of Bear Naked's trail mix or cookie

28   products. *See* Compl. ¶¶ 7-9.

24

expectation for each product, different definitions of natural held by consumers, etc. *Cf. Johnson v. Harley-Davidson Motor Co. Group*, 285 F.R.D. 573, 579 (E.D. Cal. 2012) (denying certification because "there are more than 130 configurations and numerous factors affecting heat in the class vehicles").

**B. Plaintiffs' claims require individual analysis of consumer perception and reliance.**

California's consumer fraud statutes do not permit relief for the "consumer who was never exposed in any way to an allegedly wrongful business practice." *Cohen v. DirecTV*, 178 Cal. App. 4th 966, 980 (2009). If consumers "did not purchase the [product at issue] *because of* [the deceptive practice]," there can be no presumption of reliance. *See Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 631-32 (2010) (emphasis added). Thus, certification must be denied if a court would have to make individualized inquiries regarding whether each class member was "induc[ed]" by false advertising to purchase the product at issue.

*Cohen v. DirecTV* is particularly instructive. A putative class of DirecTV costumers sued on the basis that advertisements made misleading statements about its HD transmission quality. 178 Cal. App. 4th at 969-70. As the California appellate court explained, whether plaintiffs' claims "would involve factual questions associated with their reliance on DirecTV's alleged false representations was a proper" consideration on class certification, "even after *Tobacco II.*" *Id.* at 979, 981. It found certification improper because the putative class "include[d] subscribers who never saw DirecTV advertisements or representations of any kind before deciding to purchase the company's HD services, and customers who only saw/relied upon advertisements that contained no mention [of the alleged misrepresentations], and subscribers who purchased DirecTV primarily based on word of mouth." *Id.* at 979.

Similarly in *Pfizer*, a putative class of consumers sued, complaining of supposedly misleading statements that Listerine was "as effective as floss." 182 Cal.

App. 4th at 626.   The California appellate court refused to certify a "grossly overbroad" class of all purchasers because "perhaps the majority of class members who purchased Listerine during the [relevant period] did so not because of any exposure to Pfizer's allegedly deceptive conduct, but rather, because they were brand-loyal customers or for other reasons." *Id.* at 631-32. And in *Moheb*, the Central District of California declined to certify a class of prescription drug purchasers because the plaintiff would "not be able to demonstrate, as she must to prevail on her claims, that Defendant made misrepresentations to every member of the Class, that every member of the Class exposed to the alleged misrepresentations were ignorant of the truth, that every member of the Class reasonable relied on the alleged misrepresentations, and that this reliance caused every member of the Class to suffer a financial injury without significant, time-intensive, individualized evidence." 2012 WL 6951904, at *7.[13]

The putative class here, as in *Cohen*, *Pfizer*, *Moheb*, and *Coca-Cola* is overbroad because it includes all purchasers, even those (i) who never saw the challenged statements, (ii) who (like Mr. Knolwes) did not care because they had other reasons for purchasing the products and would have purchased them even without the "100% natural" language, and (iii) whose definition of "natural" allows the inclusion of certain challenged ingredients, such as those who believe that Whole Food's public list of unacceptable ingredients (which Bear Naked complies with) is the gold standard

---

[13] *See also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) ("The relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading [and] must also exclude those members who learned of the [allegedly hidden information] before they purchased or leased [the challenged product]."); *Konik*, 2010 WL 8471923, at *9 (certification improper where "plaintiffs have failed to meet their burden of presenting sufficient evidence to support a conclusion that the challenged statements were actually false as applied to all . . . class members"); *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 228-29 (2012) (holding that proposed class that included "[t]hose who were aware of the [allegedly hidden information]" could not be certified).

for determining whether a product is natural or not.  These consumers "stand in a myriad of different positions insofar as the essential allegation in the complaint is concerned, namely, that [Bear Naked] violated the CLRA and UCL by inducing [consumers] to purchase [the snacks] with false advertising." *Cohen*, 178 Cal. App. 4th at 979; *see also Johnson*, 285 F.R.D. at 581 (certification denied because "there are innumerable variations in the experiences and information possessed by the consumers [and] in the factors that influence consumers' purchasing decisions").[14]

### C. Restitution and damages issues are subject to individualized inquiries.

The Supreme Court this past Term reiterated that a party seeking certification under Rule 23(b)(3) bears the burden of "establishing" "through evidentiary proof" "that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  And if a plaintiff fails to satisfy this burden,

---

[14] Plaintiffs are not entitled to a presumption of reliance because the materiality of the representations has not been "establish[ed] on a class-wide basis." *Shein v. Canon U.S.A., Inc.*, No. 08-7323, 2010 WL 3170788, at *10 (C.D. Cal. Aug. 10, 2010); *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011). "'[M]ateriality means that without the misrepresentation, the plaintiff would not have acted as he did.'" *True v. Am. Honda Motor Co.*, 520 F. Supp. 2d 1175, 1182 (C.D. Cal. 2007).  As the Ninth Circuit held, a representation that is material to one class member may not be "material as to all class members" and, as a result, the issue of materiality is not in all cases susceptible to common proof. *Stearns*, 655 F.3d at 1022-23; *see also Davis-Miller v. Auto. Club of S. Cal.*, 201 Cal. App. 4th 106, 122-23 (2011) ("[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action.").  That is the case here: ██████ ████████████████████████████████ Ex. 3 ¶13(I).  Plaintiffs' deposition testimony confirms that consumers buy Bear Naked products for a multitude of reasons, many of which have nothing to do with a "natural" label.  For example, Mr. Knowles testified that he probably would have purchased Bear Naked granola even if it was not labeled as "natural" because it was made with nuts, did not include high fructose corn syrup, and was on sale. Ex. 5 at 134:18-25, 136:24-137:1, 138:4-8, 141:20-142:1.

1    he or she "cannot show Rule 23(b)(3) predominance: Questions of individual damage

2    calculations will inevitably overwhelm questions common to the class." *Id.* at 1433.

3       In *Comcast*, a proposed class of cable television subscribers argued that

4    Comcast's alleged antitrust actions had led to higher prices, and offered an expert

5    witness who calculated the price that consumers would have paid "but for" Comcast's

6    alleged behavior. *See id.* at 1430, 1433-34. In reversing the grant of class

7    certification, the Supreme Court held that the lower courts failed to conduct a

8    "rigorous analysis" of whether the plaintiff's expert had proffered a proper model to

9    calculate damages class-wide in light of the "nearly endless" "permutations" of

10    individualized damages involving "2 million subscribers located in 16 counties." *Id.* at

11    1433-35. In short, the Supreme Court emphasized that plaintiffs must provide specific

12    evidence and rigorous expert analysis showing that damages for each class member

13    can be calculated easily.

14       Here, Plaintiffs fall far short of the standard established by *Comcast* because

15    they do not offer any evidence, expert opinion, or even a basic methodology to

16    calculate damages class-wide.[15] Their entire class certification motion devotes only a

17    *single* paragraph containing meaningless boilerplate language about damages.

18       Plaintiffs allege damages based on a supposed "price premium" they paid: They

19    allegedly "paid more money for the [Bear Naked] products than [they] would have had

20    to pay for other products that were not 100% natural." *E.g.*, Compl. ¶ 7. They further

21

22    _____

23    [15] Indeed, the only evidence Plaintiffs provided about the alleged price premium has
since been withdrawn because it showed that this case cannot be adjudicated on a

24    class-wide basis. Roughly 20% of respondents who answered Plaintiffs' expert's
survey question after reviewing Bear Naked packaging said that they would not pay a

25    single cent more for an "all natural" granola. Ex. 20. The remaining answers varied,
with responses in almost every one-cent increment from $0.01 to $1.00. *Id.* And

26    although Plaintiffs' expert testified that she did not know this result in the study *she*

27    commissioned, she conceded that "there is variability among consumers as to how
much more, if anything, consumers are willing to pay for all natural products." Ex. 24

28    at at 186:4-9.

claim that, "[h]ad [they] known the truth that Bear Naked's granola was not 100% natural, [they] would not have purchased Bear Naked's granola, but would have purchased another brand of granola that was truly 100% natural or, if one was not available, would have purchased other non-natural products that were less expensive than the Bear Naked granola." *Id.*

Under California law, restitution must be "based on a specific amount owing," and this measurable amount of restitution due "must be supported by substantial evidence." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 699-700 (2006). California courts accordingly have held that restitution of the full price paid or disgorgement of profits would be an improper windfall to plaintiffs because the products had at least some value to the consumers.[16]

The only truly accurate way to determine restitution is to calculate how much each individual consumer valued the absence of one or more of the challenged 13 ingredients and processes ███████████████████████████ ████████████████████████████  It would be impossible to calculate these varying amounts on a class-basis. Not surprisingly, Plaintiffs do not bother addressing this impossible task, and instead suggest that they can derive a "price premium" by looking at "substitute" food products (instead of individual ingredients). But the only way to establish restitution even under this "price premium" basis would be through

---

[16] *See, e.g., Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, (N.D. Cal. 2012) ("[e]ven if the beverages plaintiffs purchased were not all natural, they still had some market value that accrued to plaintiffs" and, thus, plaintiffs were "not entitled to a refund of their full purchase price"); *Kraft*, 2012 WL 8019257, at *11 (ruling disgorgement of all profits would be improper since "*nonrestitutionary* disgorgement is not an available remedy in a UCL class action"); *Google AdWords Litig.*, No. 08-3369, 2012 WL 28068, at *14-15 (N.D. Cal. Jan. 5, 2012); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008). In any event, Plaintiffs do not dispute that the Bear Naked products had some value. *See* Compl. ¶ 13 (suggesting challenged products had the same value as other products containing synthetic or artificial ingredients); Ex. 5 at 140:7-13.

individualized evidence establishing (1) the price each class member paid for each Bear Naked product each time it was purchased, (2) the supposed "substitute" product (out of dozens of alternative choices) each consumer would have purchased in lieu of each Bear Naked product, and (3) the price each class member would have paid for a particular substitute. Then the prices for the two products would be subtracted from each other to calculate the alleged "price premium" for each product purchased by each class member.  But it would be virtually impossible to calculate this price premium for all proposed class members on a class-wide basis.  And where "proof of restitution due each class member cannot be proved with relative ease," Rule 23(b)(3) certification must be denied. *See Google AdWords*, 2012 WL 28068, at *15.  The problems are manifold.

1. Calculating what each consumer paid for each Bear Naked product would be exceedingly complex and would require individualized analysis.

The first step in calculating the alleged "price premium" paid by class members is to determine how much each member paid for each Bear Naked product.  Plaintiffs assert, without evidence or explanation, that "damages are capable of measurement on a class basis from Bear Naked's records of sales, profits, and prices." Dkt. No. 73-1 at 21.  But Bear Naked does not have records reflecting individual consumer purchases because it does not sell its products directly to consumers.  Rather, Bear Naked sells them to various retailers — *e.g.,* Target, Ralph's, Whole Foods, CVS — and those retailers then set their own individual prices, which may further vary depending on the location of each store.

As demonstrated in Exhibit B, the price for a specific Bear Naked product varies dramatically by store, date purchased, and whether the product was on sale or a consumer used a coupon.  For example, the price per ounce for Bear Naked Peak Protein granola at a Bristol Farms in Southern California during May 2013 was $0.50, but the price at Vons during the same period was $0.29 — a *72%* price variation. *Id.*

1  Such extreme price variations are the norm.  During the same period, Bear Naked Nut

2  Cluster Crunch was selling for $0.41 per ounce at Los Angeles-area Vons but only

3  $0.30 at a nearby Target (a 35% price differential).  *Id.*[17]

4      Because Bear Naked does not maintain records of individual consumer

5  purchases, the amount paid by each consumer must, therefore, come from each class

6  member.  But class members almost certainly will not have retained receipts or records

7  of the products they purchased, how many they purchased, where they purchased

8  them, and for how much.  For example, none of the Plaintiffs said they retained any of

9  their receipts.  *See, e.g., E.g.*, Ex. 5 at 69:2-14; Ex. 6 at 67:19-22.[18]

10      Self-identification by consumers will not help, either. ████████████████

11  ██████████████████████████████████████████████████████████████

12  ████████████████████████████████ Ex. 3 ¶¶ 95-96.  Indeed,

13  Plaintiffs in this case had difficulty recalling details of their purchase history of Bear

---

16  [17] Plaintiffs suggest that the average retail price of Bear Naked products can be derived
    from Nielsen sales data, but that argument is misguided.  First, it is improper as a
17  matter of law because a remedy based on "average" retail prices or some other
    allegedly "representative" evidence "would inevitably alter defendants' substantive
18  right to pay damages reflective of their actual liability."  *See McLaughlin v. Am.*
19  *Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated in part on other grounds by*
    *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *cf. Espenscheid v.*
20  *DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013) (rejecting plaintiffs'
21  proposal to use "representative" evidence as a means of calculating damages and
    affirming decertification of class).  Second, Nielsen sales data do *not* include sales
22  from Whole Foods, a major source of sales of Bear Naked goods.  Dkt. No. 73-19 ¶ 2.
23  Third, Nielsen data will not inform how many Bear Naked products each class member
    purchased, where he/she purchased it, or when he/she purchased it — all of which will
24  affect how much each class member should be compensated.

25  [18] *Cf. Hodes*, 2009 WL 2424214, at *4 (declining to "certify FAL and UCL claims
    where court would have to examine "*who* purchased Van's frozen waffles," "*which*
26  *kind* of frozen waffles they purchased, *how many* they purchased, and whether the
27  kinds they purchased contained false nutritional information" because "likelihood that
    tens of thousands of class members saved their receipts as proof of their purchase of
28  Van's waffles is very low").

Naked products. For instance, Ms. Thurston has "no idea" how many times she purchased Bear Naked granola or the stores at which she did so. Ex. 6 at 65:23-67:22; *see also* Ex. 5 at 132:16-134:25 (Knowles does not recall which stores he purchased the granola at or how much he paid).

2. It will be virtually impossible to determine the "substitute" product that each class member would have purchased and the price she would have paid.

Even if this Court could somehow calculate the price paid by each class member for each Bear Naked product purchased, it would then face an even more difficult task: The Court would then have to determine the "substitute" product(s) he or she hypothetically "would have purchased" in lieu of the challenged Bear Naked products, and then figure out the hypothetical price(s) that each class member "would have paid" for that product.

Plaintiffs do not offer any methodology as to how this Court can determine the "substitute" product that each class member would have bought in lieu of a Bear Naked product. *Cf. In re Yasmin & Yaz Mktg., Sales Practices & Prods. Liab.*, No. 09-2100, 2012 WL 865041, at *24 (S.D. Ill. Mar. 13, 2012) (applying California law) ("Without a valid, class-wide comparator drug, establishing the existence of a measurable amount of restitution will turn on a number of [consumer]-specific factors."). Plaintiffs do not even attempt to offer a methodology because it is almost impossible to do so.

Plaintiffs' depositions reveal the near impossibility of determining the proper "substitute" product. Most Plaintiffs could not answer what substitute products they would have purchased in lieu of Bear Naked products. *See, e.g.*, Ex. 4 at 180:20-181:6. Even when they were pressed to name a single brand that they would have purchased, they could not provide an answer.

And when Plaintiffs attempted to provide examples of substitute products, they only highlighted the difficulty that this Court will face in determining the "price

premium." For example, Ms. Thurston testified that she now makes her own granola because she has been unable to find a "natural" granola that she enjoys. Ex. 6 at 77:5-8, 101:8-10. Mr. Knowles buys a variety of cereal and granola products, including Post Raisin Bran, Grape Nuts, and occasionally Udi's Granola, although he does not "consider[] them as substitutes" for Bear Naked granola. Ex. 5 at 146:4-18; *see also id.* at 156:24-157:2 (does not know what he "would . . . have purchased if [he] had not purchased the Bear Naked granola). Meanwhile, Mr. Babic could not recall a single brand of cereal or granola he has purchased other than Bear Naked. Ex. 4 at 31:25-32:20, 94:25-96:2.

As shown in Exhibits C and D, there is a panoply of potentially comparable products in the marketplace, all with varying prices. What is the proper "substitute" product for, say, Bear Naked Fruit and Nut granola? A private label brand? Raisin bran? Nature Valley granola? Another flavor of Bear Naked granola that does not include any challenged ingredients? Neither Plaintiffs nor their lawyers provided any method to determine what would be the appropriate "substitute" product for purposes of damages calculations.

The identity of the "substitute" product is highly germane because the price-per-ounce varies dramatically among potential "substitute" products. For example, Bear Naked Fruit & Nut granola was $0.37 per ounce at a Ralph's Store in Los Angeles, which was slightly more expensive than Cascadian Farms Almond granola ($0.34), but is actually *less expensive* than Nature's Path granola ($0.52), even though all of these products include one of the challenged ingredients. Ex. C. Similarly, at a Whole Foods in Los Angeles, Bear Naked Peak Protein granola was sold at $0.46 per ounce, which was more expensive than Back to Nature Vanilla Almond Agave granola ($0.42), but *less expensive* than Enjoy Life Very Berry Crunch granola ($0.48). *Id.* And even if the Court could somehow figure out which is the appropriate "substitute" brand for each proposed class member, the price for each "substitute" product will

vary by store, region, date, and whether a coupon was used or a sales promotion was in effect — much like the price varies for Bear Naked products. *See, e.g.*, Ex C (different prices for same Nature's Path granola at different stores).

\* \* \* \* \*

Courts in the Ninth Circuit and elsewhere have denied certification in similar cases, recognizing the "individualized nature of the damages calculations" necessitated by a "price premium" theory. For example, Judge Wu in the Central District denied certification in a false advertising class action involving supposed "health and wellness" labels on the packaging of Nabisco snacks. *See Kraft*, 2012 WL 8019257, at \*11, 15. The court held that class members are not entitled to full restitution or disgorgement of profits because they "undeniably received some benefit" from eating the snacks and many bought them because of "customer loyalty and other factors" unrelated to alleged misrepresentations. *Id.* at \*11. It then held that "memory issues as to what products were purchased where and in what quantities, as well as price differences at the vast array of retail establishments" would require an "individualized" analysis of "damages calculations." *Id.*

Similarly, in *Google AdWords*, several businesses sued Google, alleging that their online advertisements had been placed by Google on supposedly less valuable "parked domains" and error webpages that generate fewer user hits. 2012 WL 28068, at \*1. The court denied certification, ruling that restitution could not be determined on a class-wide basis because each advertiser derived different benefits from the advertisements. For example, "individual proof would show that [some] advertisers received significant revenues and other benefits from ads placed on parked domains and error pages." *Id.* at \*15 (plaintiff failed to "'affirmatively demonstrate[]' that restitution can be calculated by methods of common proof").

And in *Weiner v. Snapple Beverage Corp.*, the court refused to certify a class where plaintiffs failed to proffer "a reliable methodology" to calculate the "premium"

allegedly paid as a result of "all natural" labeling on a class-wide basis.  No. 07-8742, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010); *see also Johnson*, 285 F.R.D. at 582 ("It is unclear from Plaintiffs' papers how they would calculate damages and the Court finds that Plaintiffs have offered no general method to measure damages.").

As set forth above, Plaintiffs here suffer from the same infirmities highlighted by the *Kraft*, *Google AdWords*, and *Snapple* decisions:  They have not offered any "reliable methodology" to calculate the price premium; individual analysis would be required for each class member to determine the amount of restitution due; and it is nearly impossible to determine how much each class member paid for the Bear Naked goods and how many they bought.

### D. Common issues do not predominate because the Court would have to apply the laws of 50 states.

Plaintiffs request certification of a nationwide class asserting claims under California law, claiming such certification is appropriate because "Bear Naked's conduct at issue in this lawsuit emanates from California."  Mot at 23.  Plaintiffs' request is barred by *Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).  In *Mazza*, the Ninth Circuit held that "the district court abused its discretion in certifying a class under California law that contained class members who purchased or leased their car in different jurisdictions with materially different consumer protection laws."  *Id.* at 590.  This was true even though "Honda's corporate headquarters, the advertising agency that produced the allegedly fraudulent misrepresentations, and one fifth of the proposed class members [we]re located in California."  *Id.*[19]  Similarly,

---

[19] *See also Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1103 (C.D. Cal. 2012) (following *Mazza* and refusing to apply California law to nationwide claims even though "Alacer's corporate headquarters are in California, a large number of the proposed nationwide class resides in California, almost 50% [of the challenged] products were manufactured in California . . . and the corporate decisions regarding packaging and marketing of the . . . products were all made in California"); *Schwartz v. Lights of Am.*, No. 11-1712, 2012 WL 4497398, at *8-9 (C.D. Cal. Aug. 31, 2012)

here, it would be improper to certify a class under California law that includes individuals who purchased Bear Naked products outside of California.  Because the Court would need to apply the laws of 50 different states, individual questions would predominate and certification must be denied.

Under California's choice of law rules, even if "California has significant contact or significant aggregation of contacts to the claims of each class member,'" "California law may only be used on a classwide basis if the interests of other states are not found to outweigh California's interest in having its law applied." *Id.* at 589, 590.  Application of California's three-step governmental interest test confirms that California law cannot be applied on a class-wide basis in this case.

First, as demonstrated in Exhibit 27, the consumer protection laws of California differ from the laws of the other 49 states in material ways.  For example, "the California laws at issue here have no scienter requirement, whereas many other states' consumer protection statutes do require scienter." *Mazza*, 666 F.3d at 591. "California also requires named class representatives to demonstrate reliance, while some other states' consumer protection statutes do not." *Id.*; *see also Gianino*, 846 F. Supp. 2d at 1100-02 (detailing material differences in state consumer protection laws). "Moreover, even once a violation is established, there are also material differences in the remedies given by state laws." *Mazza*, 666 F.3d at 591. Second, the sales of the challenged products "took place within [50] different jurisdictions, and each state has a strong interest in applying its own consumer protection laws to those transactions." *Id.* at 592. Third, as in *Mazza*, "the last events necessary for liability as to the foreign class members" — the alleged viewing and reliance on the advertisements — "took place in the various foreign states, not in California.  These foreign states have a strong

(holding "California law cannot be applied across the Class" even though defendant was a California corporation and the challenged advertisements "were fully conceived in California").

interest in the application of their laws to transactions between their citizens and corporations doing business within their state.  Conversely, California's interest in applying its law to residents of foreign states is attenuated." *Id.* at 594.  As a result, "each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place." *Id.*[20]

Because the laws of 50 states will have to be applied in this case, "common questions of law do not predominate over the questions affecting individual class members as required by Rule 23(b)(3)." *Gianino*, 846 F. Supp. 2d at 1103.  Simply stated, *Mazza* "forecloses the certification of the proposed nationwide class[es]." *Kowalsky v. Hewlett-Packard Co.*, No. 10-2176, 2012 WL 892427, at *7 (N.D. Cal. Mar. 14, 2012).[21]

## III.   Plaintiffs' claims are not typical of the claims of the class.

Rule 23(a)(3)'s typicality requirement "ensure[s] that only those plaintiffs . . . who can advance the same factual and legal arguments may be grouped together as a

---

[20]  Plaintiffs' request to alternatively seek multi-state classes does not solve their problem.  Under Rule 23, courts must consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).  "[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001); *see also Utility Consumers' Action Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484, 487 (S.D. Cal. 2009) ("The application of several state laws to one action would make the trial exceedingly complex.").

[21]  Plaintiffs' cited cases do not suggest otherwise.  Those courts permitted application of California law to the claims of nationwide classes because, unlike in *Mazza* and here, the defendant failed "to demonstrate material differences in state law and show that other states' interests outweighed California's." *In re Pom Wonderful LLC Mktg. & Sales Practices Litig.*, No. 10-2199, 2012 WL 4490860, at *3 (C.D. Cal. Sept. 28, 2012); *see also Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 549 (C.D. Cal. 2012) ("*Mazza* is distinguishable from the present case because there the defendants 'exhaustively detailed' material differences in California and other states' laws . . . ."); *cf. Kowalsky*, 2012 WL 892427, at *7 n.2 ("[T]his Court is bound by the Ninth Circuit's decision in *Mazza* and declines to follow *Bruno*.").

class." *Broussard*, 155 F.3d at 340.  A class representative must "possess the same interest and suffer the same injury as the class members," *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982), such that the evidence needed to prove the named plaintiff's claim is probative of the others' claims.  Here, Plaintiffs' claims are not typical of class.

First, Plaintiff Knowles does not "advance the same factual and legal arguments" as the proposed class members because he purchased Bear Naked granola "for reasons wholly unrelated to" the "100% natural" label (*e.g.*, "because [he] preferred the flavor over other brands").  *Cf. Cleary v. Philip Morris USA, Inc.*, 265 F.R.D. 289, 293 (N.D. Ill. 2010).  Mr. Knowles testified that he bought Bear Naked Fruit & Nut granola in part because of the inclusion of nuts and whole grains, the absence of high fructose corn syrup, the taste, and the fact that it was on sale.  Ex. 5 at 134:18-25, 136:7-10, 136:24-137:1, 138:4-20; *see also id.* at 148:6-13 ("taste, nutritional value, and price" are factors he considers in purchasing cereal or granola). In fact, he agreed that he "probably" would have bought the Bear Naked granola even if "it didn't say all natural on it." *Id.* at 141:20-142:1, 142:21-24.

Second, Ms. Thurston is not typical of the class because she holds extreme views on "natural" foods that are not typical of Bear Naked consumers or proposed class members.  *Martinez v. Welk Grp., Inc.*, No. 09-2883, 2012 WL 2888536, at *3 (S.D. Cal. July 13, 2012) ("hypersensitive" plaintiffs are not typical of the class).  Ms. Thurston purchases "natural" foods because of a unique situation not typical of most class members.  Her pediatrician advised her to "buy all natural gluten-free, GMO free" because her son "has learning disabilities and ADHD." Ex. 6 at 10:22-11:12. There is "a long list" of food products Ms. Thurston and her children "don't eat," and she purchased Bear Naked granola solely "because it said it was pure and natural. There was no other deciding factors." *Id.* at 12:16-22, 73:18-19.  Ms. Thurston now spends more money and hours of her time to make her own granola because she has

38

been unable to find a natural granola that she likes. *Id.* at 101:8-10, 77:11-14, 102:21-103:1. Ms. Thurston's extreme and "unique background and beliefs" makes her "atypical of the class [she] seeks to represent." *Martinez*, 2012 WL 2888536, at *3.

<u>Finally</u>, Plaintiffs are not typical because the proposed class is "so broad and indefinite that [it] encompass[es] products that [Plaintiffs themselves] did not purchase." *Ocean Spray*, 2013 WL 2558125, at *4. Plaintiffs purchased only three of the 11 products identified in the complaint, which included only two challenged ingredients. Notably, Plaintiffs do not allege that they ever purchased a trail mix or cookie product. And as Mr. Knowles admitted, granola is subject to a different "natural" analysis than a cereal product, such as that bought by Ms. Thurston. Ex. 5 at 157:16-158:2. It is commonsense that a consumer would have different expectations of a chocolate cookie as compared to a fruit and nut granola. Moreover, the Court would need to conduct an entirely different analysis to determine whether a product containing an ingredient made with a processing agent such as hexane (which was allegedly not disclosed on the packaging, but which is undetectable in the final product) is "100% natural" than a product containing allegedly synthetic Vitamin E.

That these Plaintiffs' claims may be typical of "*some* of the proposed class members" is not sufficient. *See Garcia v. Sun Pac. Farming Coop., Inc.*, 359 F. App'x 724, 726 (9th Cir. 2009). They may not represent the putative class because their claims are "*a*typical of others." *Id.*

## IV.   Plaintiffs would not fairly and adequately represent the class.

Class certification should be denied if "the putative lead plaintiff gives the court *any reason to doubt* the ability to meet these fiduciary obligations." *In re Quintus Sec. Litig.*, 148 F. Supp. 2d 967, 970 (N.D. Cal. 2001) (emphasis added). To satisfy the adequacy prong, a class representative's claim must be "co-extensive with those claims of the class [s]he seeks to represent." *Turner v. A.B. Carter, Inc.*, 85 F.R.D. 360, 364 (E.D. Va. 1980). A proposed representative must also understand the allegations and

her role as a class representative, and must demonstrate an ability and desire to control the litigation.  None of these requirements has been satisfied here.

First, as amply demonstrated (*supra* at 38-39), Plaintiffs' claims are not co-extensive with the claims of the class.  Among other things, Plaintiffs cannot adequately represent consumers of products, such as cookies and trail mix, that they did not purchase, and which include different ingredients from those they bought.

Second, Plaintiffs are inadequate because they show "a lack of credibility regarding the allegations being made, or a lack of knowledge or understanding concerning what the suit is about." *Kelley v. Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409-10 (W.D. Okla. 1990).  Representatives' "'understanding should not be limited to derivative knowledge acquired solely from counsel.'" *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 587 (W.D. Tex. 2002) (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 n.18 (5th Cir. 2001)).  "[A] plaintiff that does not understand the facts of the case, or her own claim cannot fulfill the role of class representative." *Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319, 323 (M.D. Fla. 1997).  Nor is a plaintiff who "has contented himself to rely entirely upon his attorney's direction" capable of adequately representing a proposed class. *Kassover v. Computer Depot, Inc.*, 691 F. Supp. 1205, 1214 (D. Minn. 1987).[22]  Finally, a plaintiff who lacks credibility "is an inadequate class representative." *Id.* at 1213; *see also Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316-17 (E.D. Va. 2007) ("Plaintiff is inadequate because he has not demonstrated the requisite credibility to ensure that he will act as an appropriate fiduciary.").

---

[22] "An attorney who prosecutes a class action with unfettered discretion becomes, in fact, the representative of the class.  This is an unacceptable situation because of the possible conflicts of interest involved." *In re Goldchip Funding Co.*, 61 F.R.D. 592, 595 (M.D. Pa. 1974).  Among other things, "[i]f the representative client is not financially responsible, the attorneys have free rein over prosecution of the action." *Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D. Or. 1991).

Plaintiffs' deposition testimony evidences that Plaintiffs — each of whom was solicited by his or her attorneys for involvement in this suit, and many of whom have been named plaintiffs in prior cases filed by these attorneys — have no independent knowledge of the allegations in this lawsuit and will not "check the otherwise unfettered discretion of counsel in prosecuting the suit." *Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978). It has become abundantly clear that Plaintiffs are "simply lending [their] name[s] to a suit controlled entirely by the class attorney." *Beck v. Status Game Corp.*, No. 89-2923, 1995 WL 422067, at *4 (S.D.N.Y. July 14, 1995).[23]

**Milan Babic.** Mr. Babic was "approach[ed]" by an acquaintance "about bringing this lawsuit." Ex. 4 at 184:14-185:2. He does not know whether he has ever seen the operative pleading in this case, and does not recall reviewing the Complaint or discussing its contents with his attorneys before it was filed. *Id.* at 18:14-17, 20:6-

---

[23] *See also Moheb*, 2012 WL 6951904, at *5 (no adequacy since "Plaintiff became [a] class representative . . . through her long-time friendship with the mother of one of her counsel, and that counsel had been researching the possibility of a class action with respect to [the challenged product] prior to Plaintiff becoming a client"); *In re Chiron Corp. Sec. Litig.*, No. 04-4293, 2007 WL 4249902, at *12 (N.D. Cal. Nov. 30, 2007) ("Counsel's use of 'serial plaintiffs' raises the specter of credibility problems and conflicts of interest, among other issues."); *Shiring*, 244 F.R.D. at 316 (plaintiff inadequate where deposition showed plaintiff was solicited by attorney and elected to pursue litigation "based only on [class counsel's] investigation and research"); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 533-36 (N.D. Tex. 2005) (finding inadequate plaintiff who was solicited by class counsel where it was "apparent that counsel ha[d] provided the vast majority of the knowledge" she possessed regarding the suit); *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (finding inadequate repeat plaintiff who had filed prior class actions with same attorney, and who "failed to exhibit an interest in supervising the attorneys in th[e] case"); *Burkhalter Travel MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (plaintiff who "knows very little about th[e] action" and is "not entirely clear about who he seeks to represent" is inadequate); *Kelley*, 139 F.R.D. at 409-10 (plaintiff improper where his "knowledge about the case . . . c[a]me from counsel"); *Rolex*, 136 F.R.D. at 666 (plaintiff inadequate who "did not become involved in the case until after the basic groundwork had been laid" and "contributed nothing to the drafting of the complaint").

41

21:3. He was also unable to recall the brand of a single packaged food product he has purchased other than Bear Naked, including the substitute products he claims he now purchases instead of Kashi or Bear Naked products.[24]  Notwithstanding his alleged commitment to all natural foods, Mr. Babic admitted that he drinks diet soda three times a week and has purchased chocolate 50 times in the past year from stores such as CVS, as well as potato chips from sandwich shops and vending machines.  *Id.* at 22-45:4, 53:3-54:6.  And Mr. Babic could not identify a single health benefit that he perceives to flow from consuming foods that are all natural.  *Id.* at 121:17-122:3.

Mr. Babic has very limited knowledge about the ingredients challenged in this lawsuit, and what little information he has came from his attorneys.  *Id.* at 129:7-16, 133:6-22, 136:17-138:14, 140:17-142:18.  His only "understanding of what it means" to serve as a class representative is that he is "speaking for a class," but he does not know what the class is that he seeks to represent.  *Id.* at 182:9-21, 189:8-10.  Mr. Babic is not seeking any financial remuneration through this lawsuit, and is "unsure" what he is seeking for the class.  *Id.* at 185:18-23, 186:6-17.  He intends to submit his litigation-related expenses for reimbursement to his attorneys, but does not know what his arrangement is with his attorneys regarding payment.  *Id.* at 183:15-24, 185:6-8.  Mr. Babic could only recall the names of two of his attorneys, and did not know the name of the law firm that represents him.  *Id.* at 183:25-184:5.

**Chanee Thurston.**  Ms. Thurston has been a named plaintiff in four class action lawsuits filed by her counsel in this case.  *See* Ex. 6 at 107:4-110:1, 112:23-113:20.  During deposition, Ms. Thurston was unable to identify the allegedly unnatural ingredient(s) in the chocolate granola she purchased (even after reviewing the packaging).  *Id.* at 68:9-69:9, 69:18-70:9.  She admitted that the entirety of her knowledge regarding the allegedly unnatural ingredients contained in the Bear Naked

---

[24]  Ex. 4. at 30:24-31, 31:25-32:23, 34:10-12, 35:5-10, 50:16-51:8, 53:3-25, 54:22-55:15, 94:20-97:17, 104:21-23, 165:11-16, 177:21-179:5, 180:20-181:3, 199:10-200:2.

42

products she purchased came from her counsel. *Id.* at 69:14-17, 71:1-73:1, 97:7-17, 98:22-99:25. Ms. Thurston also testified during deposition that, in sharp contrast to her interrogatory response, which stated that she purchased Bear Naked's Nut Cluster Cruch Cereal "once or twice" in early 2011 (Ex. 28 at 3:23-24), she purchased the cereal roughly 10 times beginning in 2007. Ex. 6 at 78:11-79:7.

**Lawrence Knowles.** Mr. Knowles has no knowledge regarding three of the four ingredients challenged in this lawsuit, including whether they are natural or whether they are contained in Bear Naked products. Ex. 5 at 95:5-96:6, 103:14-104:4. The only information Mr. Knowles was able to provide about glycerin is his belief that it is "[a] chemical of some sort" and that it is included in Bear Naked's Fruit & Nut Granola, which he learned from "speaking with [his] attorneys." *Id.* at 99:18-101:22.

## CONCLUSION

For the foregoing reasons, Bear Naked respectfully requests that this Court deny Plaintiffs' Motion for Class Certification.

Dated: June 17, 2013

JENNER & BLOCK LLP

/s Kenneth K. Lee
By: Kenneth K. Lee

Attorneys for Defendant Bear Naked Company